UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BENJAMIN ISAAC, JR.,

                 Plaintiff,                     Civil Action No. 12-13324

          v.                           District Judge Mark A. Goldsmith
                                                Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                   Defendant.
_____/

**REPORT AND RECOMMENDATION TO**
**DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [11] AND**
**GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [13]**

Plaintiff Benjamin Isaac, Jr., appeals Defendant Commissioner of Social Security's ("Commissioner") denial of his application for disability insurance benefits and supplemental security income. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 11, 13). For the reasons set forth below, this Court finds that substantial evidence supports the ALJ's decision. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 11) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 13) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

**I. BACKGROUND**

Isaac was 35 years old on February 1, 2010, the date he alleges he became unable to work. (*See* Tr. 112.) He was diagnosed with human immunodeficiency virus (HIV) in 2000. (Tr. 184, 205.)

He also has mental health issues that include depression, anxiety, and psychosis. (Tr. 196, 197, 215, 251, 254.)

Isaac completed high school, with special education due to specific learning disability. (Tr. 34-35, 182, 213.) He attended college for one year and was a certified nurse assistant, but "his license is permanently flagged and he can no longer work in that field." (Tr. 254; *see also* Tr. 213, 253.) He has not worked since 2008, when he worked as a nurse assistant at a nursing home. (Tr. 158, 213.) He was terminated from that job when "Lansing put a flag on his license because of allegations that he had hit a resident at a prior nursing home which he said was not true." (Tr. 213.) He also has worked as a waiter and factory assembly line worker. (Tr. 158, 159.)

### A. Procedural History

Plaintiff applied for disability insurance benefits on March 29, 2010, and supplemental security income on April 15, 2010, asserting that he became unable to work on February 1, 2010. (Tr. 57, 58, 112-14, 115-21.) The Commissioner initially denied Plaintiff's disability applications on July 31, 2010. (Tr. 57, 58.) Plaintiff then requested an administrative hearing, and on April 6, 2011, he appeared with counsel before Administrative Law Judge Donald G. D'Amato, who considered his case *de novo*. (Tr. 29-45.) In an April 27, 2011 decision, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (*See* Tr. 15-25.) The ALJ's decision became the final decision of the Commissioner on June 1, 2012, when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on July 27, 2012. (Dkt. 1, Compl.)

**B. Medical Evidence**

*1. Evidence of Mental Impairments*

Isaac's school records indicate that he received special education after he was diagnosed with specific learning disability in 1984, at age nine. (Tr. 182.) The report noted that Isaac was a "slow learner." (*Id.*) It appears he was also evaluated in 1993, at age 18, for emotional impairment, and found not eligible for special education on that basis. (Tr. 180-81.)

During an initial health assessment by Wayne County Jail Health Services in January 2010, Isaac reported that he felt helpless and hopeless, and wanted his HIV to kill him. (Tr. 183, 186.) The nurse who completed the assessment indicated that Isaac "appear[ed] to be despondent or depressed" but did not "appear irrational/mentally ill." (Tr. 184.) He or she (the signature is illegible) noted that Isaac had attempted suicide by ingesting peroxide in December 2009. (Tr. 184, 186.) The nurse referred Isaac for evaluation by a psychologist. (Tr. 191.)

A comprehensive psychological evaluation was performed the same day. (Tr. 193-96.) The psychologist described Isaac as "very negativistic/fatalistic." (Tr. 193.) He or she (the signature is illegible) noted that Isaac was hospitalized for two months at 16 years old after attempting suicide by drinking bleach. (*Id.*) The psychologist indicated, however, that Isaac was not suicidal at the time of the assessment: "suicidal thoughts—but really is only wishing he could die in his sleep." (Tr. 195, 196.) The psychologist found Isaac's speech logical and goal-directed and his perceptions normal, with no evidence of psychosis. (Tr. 195-96.) He or she diagnosed depressive disorder, not otherwise

3

specified, rule out dysthymia; and cannabis dependence. (Tr. 196.) A GAF of 56 was assessed.[1] (*Id.*) The psychologist recommended outpatient counseling and evaluation for medication. (*Id.*)

Three days later, another evaluator—apparently a psychiatrist—indicated that Isaac suffered paranoia and mood swings; diagnosed adjustment disorder with depressed mood, rule out bipolar, and psychosis not otherwise specified; and assessed his GAF at "53-60." (Tr. 197.) Isaac was admitted to outpatient counseling and prescribed Klonopin and Risperdal. (Tr. 197, 200.) The psychiatrist's notes indicate that Isaac was hospitalized for two suicide attempts, at age 14 and age 16, for three to four months each time, and that the second time he tried to hang himself. (Tr. 197.)

Isaac was released from Wayne County Jail in March 2010 and began living in a group home for men with HIV or AIDS. (Tr. 197, 207, 213.)

On April 30, 2010, Isaac's primary care physician Dr. Patricia Brown noted that Isaac was attending regular sessions with behavioral health nurse practitioner Angela DiSante and that he "[f]eels his depression is much improved and he no longer has suicidal thoughts." (Tr. 207, 208.) He said "his friends tell him they can tell he is on meds because he is 'slower,'" but he did not mind because "he no longer gets angry the way he used to." (Tr. 207.)

Nurse DiSante wrote in an intake assessment dated April 2, 2010, that Isaac "made a suicide attempt 4 months ago and continues w[ith] suicidal ideation and has a plan," "has fleeting thoughts

---

[1] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"),* 30–34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32. A GAF score of 51 to 60 reflects "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

of hurting his roommates but no h[istory of] violence," "has been in Boysville/foster care for much of his life, has suffered with depression, anxiety and psychosis since childhood," and "has been trying to learn hair styling but has been unable to focus, concentrate or comprehend and is unable to earn an income." (Tr. 254.) She diagnosed schizoaffective disorder,[2] assessed a GAF of 53, continued his prescriptions for Risperdal and Klonopin, and added Celexa "for significant depressive symptoms." (Tr. 253, 254, 255.) She noted that he should "continue therapy w[ith] M. McGarrity." (Tr. 255.)

On July 3, 2010, psychologist Nick Boneff, Ph.D., examined Isaac at the request of Michigan's Disability Determination Service ("DDS"), a state agency that helps the Social Security Administration evaluate disability claimants in Michigan. (Tr. 212-16.) Dr. Boneff diagnosed schizoaffective disorder, cannabis abuse, and antisocial personality disorder. (Tr. 215.) He assigned a GAF of 50.[3] (Id.) Dr. Boneff concluded that Isaac "demonstrated limited cognitive capacities, with problems with judgment and abstract thinking, and also difficulties with concentration as evidenced by problems in performing calculations accurately" and "difficulties with immediate and short-term memory and the capacity to pay attention." (Tr. 216.) Dr. Boneff felt that Isaac would "have difficulty engaging in work-type activities at this time other than those of an extremely simple

---

[2] Schizoaffective Disorder is "a disorder in which a mood episode and the active-phase symptoms of Schizophrenia occur together and were preceded or are followed by at least 2 weeks of delusions or hallucinations without prominent mood symptoms." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* 298 (4th ed., Text Revision 2000) ("*DSM–IV*"). Schizophrenia "is a disorder that lasts for at least 6 months and includes at least 1 month of active-phase symptoms (i.e., two or more of the following: delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, negative symptoms)." *Id.*

[3] A GAF score of 41 to 50 reflects "[s]erious symptoms (e.g. suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *DSM–IV* at 34.

nature, remembering and executing a one or two-step procedure on a sustained basis, if and as motivated to do so which is somewhat questionable in my mind." (*Id.*)

On November 30, 2010, Nurse DiSante wrote that Isaac had been smoking marijuana every day and had missed appointments and stopped his psychiatric medications, although he was compliant with his HIV medications. (Tr. 249, 251.) Isaac wanted to restart the psychiatric medications "[n]ow that he can no longer smoke." (Tr. 251.) She noted that he denied feeling suicidal but had "passive wishes for death." (*Id.*) She diagnosed major depressive disorder, recurrent, severe with psychotic features; assigned a GAF of 58; and restarted his medications. (*Id.*)

Isaac's medical records include an additional five meetings with Nurse DiSante between January and March of 2011. On January 6, 2011, Nurse DiSante wrote that Isaac was "[v]ery depressed, hopeless." (Tr. 247, 248.) Isaac said he "[t]hinks others are talking and laughing about him," "[f]eels worthless," "[g]ets irritable and snaps at others," and "[w]ants to die but states he's 'too chicken' to kill himself." (Tr. 247.) Nurse DiSante reiterated her diagnosis of major depressive disorder, recurrent, severe with psychotic features; assigned a GAF of 55; and adjusted his medications, discontinuing the Klonopin and starting Xanax. (Tr. 246, 247-48.) She noted that he had "poor response to meds so far." (Tr. 247.) She also commented that he "[n]eeds intense psychotherapy" and recommended that he "[c]ontinue therapy with M. McGarrity." (*Id.*)

About two weeks later, on January 18, 2011, Isaac told Nurse DiSante that the Xanax provided "much relief" and he found it "VERY helpful": he was "even able to take the bus here

today," and he said, "I can talk to people now, getting a lot better." (Tr. 243, 244.) Nurse DiSante

assigned a GAF of 63.[4] (Tr. 244.)

On January 31, 2011, Isaac reported that he felt "great" but admitted taking two Xanax "as

well as a Vicodin that he got from a friend." (Tr. 240.) He asked about self-medicating his anxiety

with street drugs such as cocaine and wondered why he could not take Xanax and Vicodin all the

time: "what if I don't qualify for SSI, then I'll have to be able to hold down a job to support myself.

When I take these, I finally feel like I can work." (*Id.*) Nurse DiSante assigned a GAF of 65. (Tr.

241.)

On February 14, 2011, Isaac reported that he still saw "demons" but "now they are 'shadows

of demons,' so they are less threatening." (Tr. 237.) He also indicated he was having "short-term

memory problems at his volunteer job," such that "[h]e thinks he's done something (something quite

involved) and then finds out he did not do it at all." (*Id.*)

The notes from a March 2, 2011 visit appear to be incomplete, but it is apparent that Nurse

DiSante decreased Isaac's Risperdal while noting that he had not filled his January 31 Xanax

prescription. (Tr. 235.)

There is some indication that Isaac was diagnosed with a panic disorder while in jail, but no

direct evidence of the diagnosis. (*See* Tr. 205 (stating, under Past Medical History in March 2010

examination notes from Dr. Brown, "Panic disorder—just diagnosed several weeks ago"); Tr. 219

---

[4] A GAF score of 61 to 70 reflects "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV* at 34.

(stating, under Psychiatric History in a July 2010 consultative examination report by an internist, "recently diagnosed with panic attacks and anxiety").)

### 2. Evidence of Physical Impairments

Isaac was first diagnosed with HIV in 2000. (Tr. 184, 205.) He began antiretroviral therapy but quit after a month and a half and "went into denial regarding his HIV diagnosis and had no care or follow up since." (Tr. 205.) After the doctor at Wayne County Jail found that "his CD4 cells are low" Isaac requested HIV therapy. (*Id.*)

Isaac was referred to Wayne State University Physician Group, where he was examined by Dr. Brown on March 12, 2010. (Tr. 205-206.) Dr. Brown recorded that in addition to HIV, Isaac reported "an episode of zoster involving the left face in 2009—he does not have residual pain"; "recurrent genital ulcers—as frequent as 2x/month the past year" that were diagnosed as herpes simplex virus; Bell's palsy in 2008; and "panic disorder—just diagnosed several weeks ago." (Tr. 205.) On examination, Dr. Brown found mouth ulcers, which Isaac reported having frequently. (*Id.*) Dr. Brown took mouth ulcer cultures (Tr. 207) and started Isaac on antiretroviral medications (Tr. 206).

At a follow-up on April 30, 2010, Isaac was still taking his medications following discharge from jail. (Tr. 207.) His mouth ulcers had resolved and the cultures were negative for herpes simplex virus. (*Id.*) Isaac was having episodes of incontinence, which Dr. Brown felt was due to his psychiatric medications. (Tr. 209.)

Isaac was seen again on July 21, 2010, for his HIV. His viral load was 271, down from 162,967 when he started medications. (Tr. 229.) He was experiencing intermittent abdominal pain

with cramps, diarrhea, and blood in his stool but no nausea or vomiting. (*Id.*) Dr. Brown ordered a stool sample. (Tr. 230.)

No additional evidence from Isaac's primary care doctor is in the record.

On July 3, 2010, doctor of internal medicine E. Montasir examined Isaac at the request of DDS. (Tr. 219.) Dr. Montasir found that Isaac's fine and gross dexterity were intact with no atrophy or sensory changes, he ambulated well, had full range of motion of all joints, and his hearing and vision were normal. (Tr. 221.) Although Dr. Montasir noted that Isaac "had some odd behavior," including "talking to an imaginary person in the room" and saying "'[m]y friend is sitting there' once or twice," Dr. Montasir found that "other than that his behavior was appropriate," and "[t]he general neurological evaluation was essentially non-focal." (Tr. 220-21.) Dr. Montasir concluded: "Based on today's examination, the claimant should be able to work as far as his physical condition is concerned, without any limitations. There is no limitation with manipulations. Pushing, pulling and lifting should be unlimited. He should be able to climb stairs, ropes, ladders and scaffolding." (Tr. 221.)

### C.  Testimony at the Hearing Before the ALJ

#### 1.  *Plaintiff's Testimony*

At the hearing, Isaac testified that he experienced the following side effects of his HIV medication: "I have bouts of diarrhea. I feel like I'm in a fog. I'm fatigued and I, I sweat profusely. At times, I guess, shortness of breath." (Tr. 36.) The ALJ asked if he had anything more to say about the HIV, and Isaac stated, "It's killing me." (*Id.*) On examination by his attorney, Isaac confirmed that he had outbreaks of zoster or herpes on his face in the past. (Tr. 38) He also testified that he

slept "maybe 16 hours" on an average day, and that he could "be sitting somewhere and [fall] asleep" without "even realiz[ing] it." (Tr. 39.)

When asked to describe his mental conditions, Isaac testified: "Well, I know I see the demons. God is against me. I'm not one of His favorites. I have never been one of His favorites. And instead of giving me full-blown AIDS, he has given me HIV so I can suffer." (Tr. 37.) The ALJ asked how he got along with people, and Isaac stated: "I mean, not good, because I'm different, you know? I can't—I don't enunciate. I don't—I'm not smart like other people, so, I'm a joke. God's joke." (*Id.*) On examination by his attorney, Isaac confirmed that he was kicked out of his group home for "[a]ltercation," and he was now "technically" homeless. (Tr. 38.) When asked whether he felt like people were out to get him, he said "I know that they are." (*Id.*) He also confirmed that he is suicidal or wants to hurt himself "[a]t times."(Tr. 39.)

### 2. The Vocational Expert's Testimony

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with functional limitations approximating Plaintiff's. The ALJ asked about job availability for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of

> work which is not a production-line or [INAUDIBLE] simple, unskilled, with one to two step instructions. Occasionally in close proximity to co-workers and supervisors, but the individual cannot function as a member of a team. Less than occasionally in direct with the public in a low-stress environment, defined as only having occasional changes in the work setting. Further, such an individual needs to avoid hazards in the workplace, such as moving machinery and unprotected heights. Needs to be restricted to a work environment with stable temperature, stable humidity, and good ventilation. And needs to avoid climbing ladders, scaffolds, and ropes.

10

(Tr. 43.) The VE testified that available jobs for such an individual included hand packer (6,000 jobs regionally) and laundry worker (3,000 jobs regionally) at the medium exertional level, sorter (4,000 jobs regionally) and inspector (3,000 jobs regionally) at the light exertional level, and bench assembler (3,000 jobs regionally) and plastic sorter (2,500 jobs regionally) at the sedentary exertional level. (Tr. 43-44.)

The ALJ also asked about job availability for a hypothetical individual of Plaintiff's age, education, and work experience with the same restrictions as above except that in addition to any regularly scheduled breaks, the job must allow him or her to be off task at least one hour per eight-hour day. (Tr. 44.) The VE testified that no such jobs would be available. (*Id.*) Likewise, when asked about job availability for the first hypothetical individual with the additional restriction that he or she must miss more than two days of work per month, the VE testified that no such jobs would be available. (*Id.*)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.

11

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ D'Amato found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of February 1, 2010. (Tr. 17.) At step two, he found that Plaintiff had the following severe impairments: HIV, schizoaffective disorder versus major depression with psychotic features, antisocial personality disorder, history of poly-substance abuse, and history of a learning disability. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 17-19.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to

perform a full range of work at all exertional levels but with the following non-exertional limitations: requires work that is non-production line oriented, simple, unskilled, with one to two step instructions; only in occasional close proximity to co-workers and supervisors, but the claimant cannot function as a member of a team;

> less than occasional direct contact with the public in a "low-stress" environment defined as having only occasional changes in the work setting; must avoid hazards in the workplace such as moving machinery and unprotected heights; must be restricted to a work environment with stable temperatures, stable humidity, and good ventilation; and must avoid climbing ladders, scaffold, and ropes.

(Tr. 19-20.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 24.) At step five, the ALJ relied on vocational expert testimony to find that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 24-25.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the alleged onset date through the date of his decision. (Tr. 25.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th

13

Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509;  *Rogers*, 486 F.3d at 247.

## IV.  ANALYSIS

### A.  Step Three

Plaintiff argues, citing *Christephore v. Comm'r of Soc. Sec.*, No. 11-13547, 2012 WL 2274328 (E.D. Mich. June 18, 2012) (Roberts, J.), that the ALJ erred at step three because he "makes no evaluation of Plaintiff's physical symptoms in relation to those described in listing 14.00 and does not articulate his reasons for finding Plaintiff's symptoms do not meet or equal the listing requirements." (Pl.'s Mot. Summ. J. at 12.) Specifically, Plaintiff argues that the ALJ failed to discuss in his step three evaluation Plaintiff's "severe medication side effects of diarrhea and

14

incontinence" and his "zoster infections (14.08 D3), genital ulcers, oral lesions, and Bell's Palsy." (*Id.*)

The Commissioner argues that to meet  listing 14.08, the evidence must show (in addition to an HIV diagnosis) "one of several HIV-related infections, must document specific manifestations of that infection, and must show that the infection is not controlled by medication." (Def.'s Mot. Summ. J. at 7.) According to the Commissioner, Plaintiff did not "point to any evidence that demonstrates that his HIV infection actually satisfies the requirements." (*Id.*) The Commissioner maintains that "there are simply no documented medical findings remotely severe enough to equal the criteria of Listing 14.08." (*Id.* at 9.)

The Court tends to agree with the Commissioner and finds that ALJ D'Amato's step three finding is supported by substantial evidence.

In *Christephore*, the ALJ did not discuss listing 14.08, the listing for HIV; he mentioned the broader listing 14.00, Immune System Disorders, but did not specifically evaluate Christephore's physical symptoms in relation to those described in the listing, and did not articulate his reasons for finding that Christephore's symptoms did not meet or equal the listing criteria. 2012 WL 2274328 at *6. Judge Roberts remanded for a proper step three analysis. *Id.* at *10.

Here, by contrast, ALJ D'Amato did discuss listing 14.08:

> Specifically, despite a diagnosis of HIV, the claimant does not meet listing 14.08 because there is no evidence of recurrent bacterial infections, fungal infections, or viral infections that do not respond to treatment. Nor does the record contain evidence that the claimant had malignant neoplasms that failed to respond to treatment.

(Tr. 18.) The ALJ's discussion did not explicitly address every aspect of listing 14.08, but it is apparent that he compared Isaac's medical evidence to the listing requirements. Plaintiff argues that

15

ALJ D'Amato failed to address his diarrhea, incontinence, zoster infections, genital ulcers, oral lesions, and Bell's Palsy, but the evidence does not support that Plaintiff suffered any of these ailments at the level of severity required by the listing.

Listing 14.08 requires documentation of HIV infection plus one of the following: (A) certain, specified bacterial infections; (B) certain, specified fungal infections; (C) certain, specified Protozoan or helminthic infections; (D) certain, specified viral infections, including herpes simplex and herpes zoster in particular cases; (E) malignant neoplasms; (F) other conditions of the skin or mucous membranes with extensive fungating or ulcerating lesions not responding to treatment; (G) HIV encephalopathy; (H) HIV wasting syndrome; (I) diarrhea lasting for 1 month or longer, resistant to treatment, and requiring intravenous hydration, intravenous alimentation, or tube feeding; (J) certain specified infections if resistant to treatment or requiring hospitalization or intravenous treatment three or more times in a 12-month period; or (K) repeated manifestations of HIV infection (including those listed in 14.08A to J but without the requisite findings for those listings) resulting in significant, documented symptoms or signs and marked limitation of activities of daily living, social functioning, or concentration, persistence, or pace. 20 C.F.R. Part 404, Subpart P, Appendix 1, at § 14.08.

To meet the listing for HIV with herpes simplex virus, the herpes simplex virus must cause one of the following: (a) mucocutaneous (such as oral) infection lasting for one month or longer; (b) infection at a site other than the skin or mucous membranes, such as bronchitis; or (c) disseminated (widespread) infection. 20 C.F.R. Part 404, Subpart P, Appendix 1, at § 14.08(D)(2). The only evidence that Isaac had herpes simplex is in a "past medical history" note indicating that Isaac reported recurrent genital ulcers that had been diagnosed as herpes simplex. (Tr.

16

205.) There is no actual diagnosis or evidence of recurrent genital ulcers in the record for the period at issue. Isaac's mouth ulcers were negative for herpes simplex virus and moreover they were successfully treated. (Tr. 207.)

To meet the listing for HIV with herpes zoster, the zoster must be either disseminated (widespread) or "[w]ith multidermatomal eruptions that are resistant to treatment." 20 C.F.R. Part 404, Subpart P, Appendix 1, at § 14.08(D)(3). It appears that Isaac's zoster was limited to one outbreak on his face in 2009. (Tr. 38, 205, 220.) Nor can Isaac meet the listing for HIV with diarrhea, § 14.08(I), as there is no evidence that he required intravenous hydration, intravenous alimentation, or tube feeding as a result of his chronic diarrhea.

Although incontinence and Bell's Palsy are not mentioned in the listing, they could be considered under § 14.08(K). But the ALJ found, in evaluating whether Isaac's mental impairments met the criteria for listings 12.03 and 12.04, that Isaac did not have, as 14.08(K) requires, marked limitation of his activities of daily living, social functioning, and concentration, persistence, or pace. (Tr. 18.) Of course, that analysis was limited to Isaac's mental impairments. For example, in evaluating Isaac's social functioning, ALJ D'Amato noted that Isaac did not get along well with others, was removed from his group home for fighting, and had served time in jail. (*Id.*) Yet the addition of occasional facial lesions and mouth ulcers and chronic but not debilitating diarrhea and incontinence is not enough to convert Isaac's mild limitation in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in concentration, persistence, or pace into marked limitations on all three counts. Moreover, Dr. Montasir, the doctor of internal medicine who examined Isaac for DDS, concluded that Isaac should be able to work without any

17

limitations. (Tr. 221.) In the face of that opinion, this Court cannot say that ALJ D'Amato's step three finding was not supported by substantial evidence.[5]

## B.  RFC

Plaintiff argues that the RFC is unsubstantiated, unexplained, and at odds with the ALJ's finding that Isaac suffers from HIV, schizoaffective disorder versus major depression with psychotic features, antisocial personality disorder, history of poly-substance abuse, and history of a learning disorder. (Pl.'s Mot. Summ. J. at 13-14.) According to Plaintiff, the ALJ's RFC determination did not comply with SSR 96-8p's narrative discussion requirement. (Id. at 14-15.) Specifically, Plaintiff complains that the ALJ did not account for Plaintiff's need to lie down, severe fatigue, "explosive diarrhea," and serious emotional problems. (Id. at 14-15.) Plaintiff also challenges the ALJ's reliance on Smith v. Comm'r of Soc. Sec., 482 F.3d 873 (6th Cir. 2007), for the proposition that a GAF score

---

[5] Plaintiff did not argue that ALJ D'Amato improperly failed to consider the opinion of a medical consultant on the issue of equivalence. This Court, in comparing the evidence to the complex requirements of listing 14.08, believes that an expert opinion on equivalence would have been helpful. Indeed, the Commissioner requires that the "judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180 at *3; see also 20 C.F.R. § 416.926(c); Retka v. Comm'r of Soc. Sec., 70 F.3d 1272 (6th Cir. 1995) ("Generally, the opinion of a medical expert is required before a determination of medical equivalence is made."); Harris v. Comm'r of Soc. Sec., No. 12-10387, 2013 WL 1192301, at *6-8 (E.D. Mich. Mar. 22, 2013) (Ludington, J.) ("the great weight of authority holds that a record lacking any medical expert opinion on equivalency requires a remand"); Manson v. Comm'r of Soc. Sec., No. 12-11473, 2013 WL 3456960, at *11 (E.D. Mich. July 9, 2013) (Cohn, J. adopting Michelson, M.J.) (remanding for an expert opinion regarding whether the listings for mental disorders, including Listing 12.04, have been met). But in this case, the single decisionmaker who made the initial determination that Isaac was not disabled consulted a psychologist, Edward Czarnecki, Ph.D., on the issue of equivalence to the mental impairment listings. (See Tr. 50, 57, 58.) In addition, the ALJ obtained and relied upon consultative examinations by both a physician and psychologist. (Tr. 21, 22.) On this record, the Court does not find any procedural error requiring remand at step three, especially in light of the Court's conclusion that Isaac's evidence of impairments fell short of the severity required to meet listing 14.08.

over 50 is consistent with the ability to work. (*Id.* at 15.) Finally, Plaintiff points out that the vocational expert testified that no jobs would be available "based on claimant's need to nap throughout the day and his difficulty concentrating and severe fatigue." (*Id.* at 16.)

Defendant responds that "no source in the record suggested that Plaintiff was physically limited by his HIV infection in any way," and points to Dr. Montasir's conclusion that Plaintiff should be able to work without limitations. (Def.'s Mot. Summ. J. at 10.) Similarly, "there is no evidence to suggest that Plaintiff has greater mental limitations than those assessed by the ALJ," according to Defendant. (*Id.*) Defendant argues that the ALJ "properly evaluated the evidence of Plaintiff's mental condition," and properly accommodated them "by limiting him to simple, unskilled work that is not at a production pace; that requires no more than occasional contact with co-workers, supervisors, and the public and does not require being part of a team; and that is low-stress." (*Id.* at 10-11.) Defendant also argues that the ALJ did not rely on Plaintiff's GAF scores to find he was disabled, and that the ALJ properly rejected VE testimony based on symptoms that the ALJ did not find credible. (*Id.* at 11-12.)

First, Isaac's argument that the RFC is unsubstantiated, unexplained, and not in compliance with SSR 96-8p's narrative discussion requirement is not well taken. The ALJ devoted four pages to careful review and assessment of the evidence, formulated a detailed summary of Isaac's limitations, and cited specific evidence in support of his conclusions. (*See* Tr. 20-23.) This was sufficient. *See* SSR 96-8p; *see also Kornecky*, 167 F. App'x at 508 (holding that the ALJ need not discuss every piece of evidence in the administrative record).

Likewise, ALJ D'Amato adequately accounted for Isaac's physical impairments in the RFC. Isaac's apparent indignation that "[t]here is not a scintilla of evidence to support [the] RFC

19

assessment that Mr. Isaac would be capable of work at all exertional levels on a sustained basis"
overlooks the fact that the burden to prove impaired function is on the plaintiff. *See Preslar*, 14 F.3d
at 1110. Moreover, the ALJ relied upon the findings of consultative examiner Dr. Montasir, who
concluded that Isaac should be able to work without any limitations. (*See* Tr. 21, 221.) Plaintiff does
not suggest any reason to reject Dr. Montasir's opinion. Although Isaac argues that "[t]he ALJ never
acknowledges in his decision the available medical [evidence] which supports claimant's assertions
that he has severe fatigue and 'explosive diarrhea,'" Isaac does not provide any citations to evidence
to support this assertion. (Pl.'s Mot. Summ. J. at 15.) The Court could not find evidence in the
medical records that Isaac suffered from "severe fatigue." In fact, Dr. Brown noted at an April 30,
2010, examination that Isaac was "negative for fatigue." (Tr. 207.) The only evidence of fatigue is
Plaintiff's testimony, which the ALJ discussed and found partially not credible. (Tr. 20, 23.) The
medical records regarding Isaac's diarrhea report that it is "[i]ntermittent" or "occasional" (Tr. 220,
230) with no indication that it would require extra break time from work. ALJ D'Amato's
conclusion that physically, Isaac was capable of work at all exertional levels is supported by
substantial evidence.

ALJ D'Amato's assessment of Isaac's non-exertional limitations is more problematic. The
ALJ appears to have relied on his interpretation of the opinion of Dr. Boneff, the consultative
examining psychologist, that "claimant would maintain the ability to perform extremely simple
tasks." (Tr. 22.) That is not exactly what Dr. Boneff said. Dr. Boneff's full conclusion states:

> Based on today's exam, the claimant demonstrated limited cognitive
> capacities, with problems with judgment and abstract thinking, and
> also difficulties with concentration as evidenced by problems in
> performing calculations accurately. He also displayed difficulties
> with immediate and short-term memory and the capacity to pay
> attention. He would be felt to have difficulty engaging in work-type

20

> activities at this time other than those of an extremely simple nature, remembering and executing a one or two-step procedure on a sustained basis, if as motivated to do so which is somewhat questionable in my mind.

(Tr. 216.) Dr. Boneff's conclusion that Isaac could perform "extremely simple" tasks on a sustained basis is qualified by his caution "if and as motivated to do so which is somewhat questionable in my mind." Dr. Boneff's use of the word "motivated" is ambiguous. It is not clear whether Dr. Boneff felt that Isaac was capable of this type of work but might be too lazy to do it, or whether he felt that Isaac's ability to do even simple work was compromised by his cognitive impairments, which included problems with judgment, difficulties with concentration, and limited capacity to pay attention. If the former, then the ALJ rightly disregarded the qualification; if the latter, the ALJ should have taken it into account in the RFC. ALJ D'Amato apparently chose to read Dr. Boneff's opinion as saying that Isaac was capable of "extremely simple" work. While this Court might read the opinion differently,  ALJ D'Amato's reading was reasonable. The Court will not override the ALJ's reasonable interpretation. *See Cutlip*, 25 F.3d at 286.

ALJ D'Amato also relied on Isaac's GAF scores in formulating the RFC. He accorded "great weight" to Isaac's GAF scores of 56 and "53-60" (which he erroneously read as 55 to 60). (Tr. 21-22.) Isaac received those scores from a psychologist and a psychiatrist at Wayne County Jail in January 2010. (Tr. 196, 197.) The ALJ noted that two other sources "came to similar conclusions." (Tr. 22.) Dr. Boneff assigned a GAF of 50 in July 2010. (Tr. 215.) Nurse DiSante, who treated Isaac for at least a year, assigned GAF scores of 53 in April 2010, 58 in November 2010, and 55, 63, and 65 in January 2011. (Tr. 241, 244, 248, 251, 255.)

ALJ D'Amato noted that the Sixth Circuit "has indicated that a GAF of 50 is consistent with the ability to work." (Tr. 22.) The Sixth Circuit did state that a GAF "in the high 40s to mid 50s

21

would "not preclude" a claimant from "having the mental capacity to hold at least some jobs in the national economy." *Smith*, 482 F.3d at 877. But the court prefaced its statement by saying "[e]ven assuming GAF scores are determinative." The Social Security Agency has stated that GAF scores are an example of "valuable additional functional information" that can be provided by a medical source, but the GAF scale "does not have a direct correlation to the severity requirements in [the agency's] mental disorders listings." 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000). Plaintiff "strongly objects to the ALJ's assessment of Smith" although his own characterization of what the case says is at least as distorted. (*See* Pl.'s Mot. Summ. J. at 15.)

It does appear that the ALJ may have relied on *Smith* to interpret Isaac's GAF scores as evidence that he was capable of working, which is not exactly what *Smith* says. But ALJ D'Amato found that the GAF scores were "consistent with objective evidence regarding the claimant's mental health." (Tr. 22.) He discussed other evidence of Isaac's mental health, including the narrative opinions of the treating and examining sources, Isaac's school records, and Isaac's own testimony. (Tr. 21-23.) In particular, the ALJ noted that Isaac's treatment records show he improved since he began taking psychotropic medications, and that his daily activities include reading and writing poetry, regularly attending church, using public transportation, and performing light household chores. (Tr. 23.) ALJ D'Amato's use of Isaac's GAF scores as some evidence, corroborated by other consistent evidence, that Isaac was mentally capable of working was not clearly erroneous. Again, this Court might have come to a different conclusion in light of Isaac's statement that he still sees "shadows of demons" (Tr. 237), his conversation with an imaginary friend during Dr. Montasir's examination (Tr. 220), and his inability to understand why he could not take cocaine in order to feel

good enough to work (Tr. 240). But ALJ D'Amato's different interpretation of the evidence was not unreasonable.

Finally, Isaac argues that the "vocational expert clearly stated no available jobs were available . . . . based on claimant's need to nap throughout the day and his difficulty concentrating and severe fatigue." (Pl.'s Mot. Summ. J. at 16.) Isaac apparently refers to the second hypothetical question posed to the expert. The first hypothetical question was based on the RFC that the ALJ eventually adopted, and resulted in several thousand available jobs. (Tr. 43-44.) The second hypothetical added the requirement that "in addition to any regularly scheduled breaks, the job must allow him or her to be off task at least one hour per eight-hour day. (Tr. 44.) The ALJ apparently decided not to include this requirement in the RFC based on his weighing of the evidence. That will not justify reversing for an award of benefits here, where the ALJ's decision falls within the "zone of choice" within which a decisionmaker can go either way. *See Mullen*, 800 F.2d at 545. The ALJ's decision is supported by substantial evidence, so should be affirmed.

### C. Credibility

Isaac also argues that ALJ D'Amato erred in evaluating his credibility. A court is to accord an "ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). But an ALJ must not reject a claimant's "statements about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2); *see also* S.S.R. 96-7p, 1996 WL 374186. Instead, the regulations provide a non-exhaustive list of other

considerations that should inform an ALJ's credibility assessment: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant received for relief of pain or other symptoms; (6) any measures the claimant used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3). The ALJ need not explicitly discuss every factor but the "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." S.S.R. 96-7p, 1996 WL 374186 at *2.

Isaac argues that ALJ D'Amato "did not touch any of the factors in any meaningful way as to justify his conclusion that the Plaintiff was not credible." (Pl.'s Mot. Summ. J. at 17.) He quotes at length from a Seventh Circuit case, *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012), that criticizes ALJs' use of boilerplate language stating that a claimant's allegations are "not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Pl.'s Mot. Summ. J. at 17.) This Court has previously agreed with the quoted discussion from *Bjornson*. *See, e.g.*, *Tell v. Comm'r of Soc. Sec.*, No. 11-CV-15071, 2012 WL 3679138, at *9-11 (E.D. Mich. July 13, 2012) (Michelson, M.J.), *report and recommendation adopted*, 2012 WL 3542473 (E.D. Mich. Aug. 16, 2012) (Goldsmith, J.). But this is not a case where the ALJ used the boilerplate language "without linking the conclusory statements contained therein to evidence in the record or even tailoring the paragraph to the facts at hand," as in *Bjornson*.

24

The boilerplate credibility language in ALJ D'Amato's opinion serves to introduce six paragraphs in which the ALJ analyzes specific evidence pertaining to several of the factors from the regulation's non-exhaustive list. (Tr. 22-23.) ALJ D'Amato discusses Isaac's daily activities, which he finds "inconsistent with an individual that is precluded from performing all kinds of work," and Isaac's medications, which he finds "have proved effective in controlling the claimant's symptoms." (Tr. 23.) He also discusses Isaac's failure to follow his doctor's advice to stop drinking (*id.*), which is an acceptable factor to consider in weighing a claimant's credibility. *See* SSR 96-7p, 1996 WL 374186 at *7 ("[T]he individual's statements may be less credible if the . . . medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.").

Plaintiff argues that the ALJ mischaracterized Isaac's daily activities because he did not expressly consider that Isaac lived in a "highly supportive home for men with HIV and mental illness" where he is reminded by staff to look after his personal hygiene and do light chores, and that while he does go to church he does not participate very often. (Pl.'s Mot. Summ. J. at 19; Pl.'s Reply at 3-4.) Plaintiff also argues that Isaac's ability to perform activities intermittently does not contradict his assertion that he cannot perform work-related tasks on a sustained basis. (Pl.'s Reply at 4.) Certainly, the fact that Isaac performed "light chores" and took public transportation is not necessarily incompatible with his testimony that he could not lift more than 10 pounds or walk more than 15 minutes. (Tr. 155.) This is especially true upon closer examination of those "light chores": Isaac said that he is not trusted around the stove or oven, but has been assigned to wipe down doorknobs and clean window seals, which takes about an hour and a half because he tires quickly. (Tr. 152.) But the Court is mindful of the deference required in a credibility determination. *See*

25

*Jones*, 336 F.3d at 476. The ALJ personally observed the plaintiff testifying. This Court has not had that opportunity. This is not a case where the ALJ failed to discuss his reasoning, or offered explanations that were not consistent with the record. *Cf. Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007). It is not enough to say that the evidence is "not necessarily" inconsistent with the claimant's testimony. The ALJ found that it was inconsistent, and that judgment was not unreasonable.

Isaac also argues that "[t]here is not one mention in the decision of the severe side effects of the AIDS medications nor the psychotropic medications Plaintiff is taking" and lists typical side effects associated with Isaac's medications. (Pl.'s Reply at 3.) The potential side effects of a claimant's medications are not relevant absent some indication that the claimant actually suffers those side effects. It is not clear how Isaac thinks this information bears upon the ALJ's credibility finding. Perhaps the fact that Isaac's medications cause fatigue could give credibility to his testimony that he sleeps 16 hours a day, but, as noted, the Court could find nothing in Isaac's medical records about fatigue or excessive sleep, and Isaac has not cited any such evidence. Where Isaac never complained about a side effect to his doctors, the ALJ's failure to discuss a potential side effect is hardly error.

The Court does agree with Isaac that the fact that he was fired from his last job does not "suggest[] that the claimant's symptoms are not as severe as alleged in his application." (Tr. 23.) Nor is it true that "claimant stopped working for reasons unrelated to his impairments" as the ALJ states. (*Id.*) Isaac said he was fired because of "allegations that he had hit a resident at a prior nursing home . . . ." (Tr. 213.) Because Isaac's impairments include psychological issues, being fired for a personal conflict is related to his alleged disability. Regardless, it does not appear that Isaac ever said he left

26

that job because of his impairments, as in the case that the Commissioner cites, *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 438 n.2 (6th Cir. 2012) (comparing contradictory statements from claimant about why he lost his job). Isaac alleged that he became disabled in February 2010 (Tr. 112), but he has not worked since 2008 (Tr. 158, 213). Absent conflicting testimony, Isaac's credibility would not be undermined if he had stopped working for reasons other than his impairments.

Nonetheless, the ALJ based his credibility finding on multiple reasons, some of which are reasonable. Substantial evidence supports the ultimate decision to partially credit Isaac's testimony, so the erroneous reliance on the circumstances of Isaac's termination from his last job was harmless. *See Ullman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (holding that harmless error analysis applies to credibility determinations in the social security disability context).

## V.  CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that substantial evidence supports the ALJ's decision. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 11) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 13) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VI.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States*

*v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  July 22, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 22, 2013.

s/Jane Johnson
Deputy Clerk

28